IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

v.

LYNDON FACISCO MILLER

Criminal No. ELH-13-00342

**MEMORANDUM OPINION**

On June 26, 2013, a federal grand jury returned a seven-count indictment against Lyndon Facisco Miller and Sophia Lorraine Warmington (ECF 12), charging them with conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin, five hundred grams or more of cocaine, and twenty-eight grams or more of cocaine base (i.e., crack cocaine), all in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count One).  Count Two charges that on June 22, 2013, defendants possessed with intent to distribute one hundred grams or more of heroin, five hundred grams or more of cocaine, and twenty-eight grams or more of cocaine base.  In Count Three, Miller is charged with distribution of heroin on May 21, 2013.  In Count Four, Miller is charged with distribution of heroin on May 28, 2013.  Both defendants are charged in Count Five with distribution of 100 grams or more of a substance or mixture containing heroin on June 20, 2013.  Count Six charges Miller with possession of a loaded firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c).  Finally, Count Seven charges Miller with being a felon in possession of a loaded firearm, in violation of 18 U.S.C. § 922(c)(1).

Warmington pled guilty to Count One on February 10, 2014, and awaits sentencing. Miller filed several pretrial motions.[1]  The following defense motions are pending: (1) Motion to Suppress Evidence Obtained By Electronic Surveillance and Intterception [sic] (ECF 74); (2) Motion to Suppress Evidence Obtained by or Derived from GPS Installation Monitoring (ECF 75); (3) Motion to Suppress Tangible Evidence (ECF 76); (4) Motion to Amend/Correct Motion to Suppress Obtained by Electronic Surveillance and Interception (ECF 77)[2]; (5) Motion to Suppress Tangible (ECF 93); (6) Motion to Amend Motion [to] Suppress Tangible Evidence (ECF 94); (7) Motion to Suppress Wiretap Evidence (ECF 95-2); (8) Motion for Extension of Time to File Motion for Leave to File Late Motions (ECF 95); (9) Defendant's Motion for Leave to Late File Motions (ECF 99).[3]  And, on September 22, 2014, defense counsel belatedly filed a "Supplemental Motion To Suppress Wiretap Evidence."  ECF 117.  The government's responses are found at ECF 78, ECF 98, ECF 111, and ECF 113.  Both sides have also submitted multiple exhibits.

The court held a motion hearing on July 28, 2014.  As to certain motions or portions of them, the defense submitted on its filings.  Testimony was presented with respect to the arrest of the defendant on June 24, 2013, the search of the rental car that defendant was operating at the time of his arrest, as well as statements allegedly made by Miller after his arrest.  Due to the filings by defense counsel on the eve of the motions hearing, the court allowed the government

---

[1] Trial is scheduled for November 17, 2014.  Delays in this case have been occasioned, *inter alia*, by a substitution in defense counsel for Miller, *see* ECF 35, 36, 81; a competency evaluation of Miller, *see* ECF 68, 69; and the filing by Miller of many pretrial motions.

[2] ECF 77 is an amendment to ECF 74, but it pertains only to the Pen Register/Trap and Trace issue within ECF 74, and not the portion of ECF 74 challenging the wiretaps.

[3] Some of the motions were filed by Miller's previous defense counsel.  Because Miller is represented by able counsel, I will deny his pro se motion to suppress wiretap evidence, filed September 8, 2014.  *See* ECF 114.  Counsel's motions for extensions (ECF 95, 99) are granted.

to submit a post-hearing supplemental response, and to call additional witnesses at a second hearing, to be held on October 3, 2014.   Moreover, the government has not yet had an opportunity to respond to ECF 117, the wiretap motion that pertains to the following telephone lines: (251) 421-4575; (443) 252-1294; (724) 255-8960; and (302) 388-8195.   Therefore, this Memorandum Opinion addresses only those motions that are ripe for disposition.[4]

### 1. Motion to Suppress Evidence Obtained by Electronic Surveillance and Interception (ECF 74, ECF 95-2).

On May 6, 2013, Joseph Cassilly, State's Attorney for Harford County, Maryland, submitted an ex-parte application for a wiretap order, supported by a 48-page affidavit executed by Detectives Aaron Penman and Thomas Gregory of the Harford County Sheriff's Office and Maryland State Police Detective Neil Miranda.   *See* "Wiretap Affidavit," ECF 78-3.   On the same date, the Honorable Angela Eaves, Associate Judge of the Circuit Court for Harford County, signed an ex parte order authorizing interception of cellular telephone number (443) 545-4592 "and any telephone lines utilized" by Miller.   Order of May 6, 2013, ECF 78-4.   On June 4, 2013 and June 5, 2013, Judge Eaves signed ex parte orders related to additional telephones utilized by defendant.[5]   All of the applications and orders were submitted pursuant to Md. Code, § 10-408 of the Courts & Judicial Proceedings Article ("C.J.").

In ECF 74, Miller contends that the wiretap orders issued by Judge Eaves violated 18 U.S.C. § 2516, § 2518(1)(c), § 2518(5), and §§ 2518(3)(a) and (b).   ECF 74 at 4, 6, 9, 10. Therefore, he contends that he is entitled to suppression under 18 U.S.C. § 2518(10)(a).   *Id.* at

---

[4] In particular, this Memorandum Opinion does not resolve arguments as to the use of a pen register/trap and trace, including the reference to the name "Dwight Narcis"; the motion to suppress defendant's statements on the date of Miller's arrest; the motion challenging the search of the rental vehicle on the date of defendant's arrest, or the wiretap challenge contained in ECF 117.

[5] I was not provided with copies of Judge Eaves's subsequent ex parte orders.

11.  Moreover, Miller contends that the wiretap orders constituted general warrants, in violation of the Fourth Amendment to the United States Constitution.

In ECF 95-2, defendant relies on C.J. § 10-408(c)(3) for the contention that Judge Eaves was only permitted to authorize the interception of electronic communications so long as the communications were "'*received or sent by a communication device anywhere within the State* so as to permit the interception of the communications regardless of whether the communication device is physically located within the jurisdiction of the court in which the application was filed at the time of the interception … .'" *Id.* at 1-2 (quoting C.J. § 10-408(c)(3)) (emphasis added by defendant).  Miller asserts that the Harford County Task Force unlawfully intercepted calls between defendant and Heberto Ortiz-Gutierrez, who lived in Pennsylvania, while the two were in Pennsylvania.  But, Miller maintains that only those communications occurring within the State of Maryland could be lawfully seized under Judge Eaves's Order.

I will address each of Miller's contentions in turn.

C.J. § 10-408(c) permits a Maryland judge to enter an ex parte order authorizing the interception of "wire, oral, or electronic communications . . . sent by a communication device anywhere within the State."  The Maryland Court of Appeals has construed portions of the Maryland statute to be *in pari materia* with Title III of the Omnibus Crime Control and Safe Streets Act of 1968, codified at 18 U.S.C. § 2510 *et seq. See Davis v. State,* 426 Md. 211, 214, 43 A.3d 1044, 1045-46 (2012).  Therefore, in analyzing defendant's contentions, I will refer to both Maryland law and federal statutory law, as they are quite similar with respect to electronic surveillance.

As noted, Miller advances several arguments challenging the legality of the wiretap.  He contends that the ex parte orders were based on affidavits that lacked probable cause; that the

monitoring agents failed to properly minimize calls; that the investigators failed to exhaust other less intrusive investigative procedures; that the wiretap orders constituted general warrants; and that the Harford County Task Force unlawfully intercepted calls between defendant and Mr. Gutierrez when both were in Pennsylvania, and thus the interception was outside the jurisdiction of the State of Maryland.  *See* ECF 74; 95-2.

Under Maryland law, before authorizing interception of wire or electronic communications, a Maryland circuit court judge must find the following, in accordance with C.J. § 10-408(c), which states, in part:

> (c)  *Issuance of order.* – Upon the application the judge may enter an ex parte order . . . authorizing interception of wire, oral, or electronic communications within the territorial jurisdiction permitted . . . if the judge determines on the basis of the facts submitted by the applicant that:
> (i)     There is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in [C.J.] § 10-406 of this subtitle;
> (ii)    There is probable cause for belief that particular communications concerning that offense will be obtained through the interception;
> (iii)   Normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous; and
> (iv)   There is probable cause for belief:
> > 1.  That the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of the offense … .

These Maryland statutory requirements are consistent with those articulated in 18 U.S.C. § 2518(3).  Accordingly, I look to federal cases for guidance.

In *United States v. Clerkley*, 556 F.2d 709, 716 (4th Cir. 1977), *cert. denied*, 436 U.S. 930 (1978), a gambling case that involved electronic surveillance, the Fourth Circuit said:

> In analyzing a given case, the federal courts have considered three principal factors:  (1) the nature and scope of the alleged criminal enterprise; (2) the government's reasonable expectation as to the content of, and parties to, the conversations; and (3) the degree of judicial supervision while the wiretap order is being executed.

In my view, and as discussed, *infra,* these factors weigh in favor of the government.

The standard of probable cause for the issuance of a wiretap order is akin to the probable cause standard that governs an ordinary search warrant.  *See United States v. Biaggi*, 853 F.2d 89, 95 (2d Cir. 1988); *United States v. Talbert*, 706 F.2d 464, 467 (4th Cir. 1983).  Therefore, an applicant need only establish "a fair probability" that communications concerning the offense will be obtained, based upon the totality of the circumstances.  *See United States v. DePew*, 932 F.2d 324, 327 (4th Cir. 1991); *see also United States v. Leisure*, 844 F.2d 1347, 1354 (8th Cir. 1988) ("It is sufficient that the information in the affidavit, when assessed in its totality, was sufficient to support a reasonable belief that evidence of criminality by the subject of surveillance would be obtained.").  "Applications for electronic surveillance orders, like search warrants, are to be read 'in a common sense and realistic fashion.'"  *United States v. Errera*, 616 F. Supp. 1145, 1149 (D. Md. 1985) (citation omitted).

The Wiretap Affidavit contains detailed information pertaining to the involvement of Lyndon Miller in narcotics distribution.  ECF 78-3.  It describes information pertaining to defendant's drug trafficking "from three separate proven reliable confidential informants and two confidential sources."  ECF 78-3 at 11.  The affiants also recount controlled drug purchases made by an informant from Miller.  *Id.* at 10.  A drug exchange is described in detail on page 16.  And, beginning on page 16, and continuing through page 18, the affiants describe defendant's "long history of renting vehicles," *id.* at 17, and aver that drug dealers "commonly use rental cars to distribute drugs," for the reasons explained in the affidavit.  *Id.*

The Wiretap Affidavit contains other substantial information, such as an investigation of defendant's financial status.  The investigation revealed no reported Maryland wage history for

Miller, suggesting that he had an illegitimate source of income.  ECF 78-3 at 39.  In addition, the affidavit identified a variety of telephone numbers linked to Miller.

Generally, the burden is on defendant to show illegality in connection with the issuance of the wiretap order.  *United States v. Matlock*, 415 U.S. 164, 177 (1974).  Moreover, "[g]reat deference is normally paid" to the determination of the issuing judge, who is "in the best position to determine if probable cause has been established in light of the circumstances as they appear at the time."  *DePew*, 932 F.2d at 327; *see also United States v. McKinney*, 785 F. Supp. 1214, 1220 (D. Md. 1992).

In my view, the Wiretap Affidavit articulated ample grounds to support the finding of probable cause made by Judge Eaves, the issuing judge, to the effect that Miller was involved in the trafficking of controlled substances, had used and would continue to use the targeted telephones in furtherance of those crimes, and that evidence of those crimes would be obtained if communications were intercepted.

Defendant also contends that investigators failed to comply with the minimization requirement set forth in 18 U.S.C. § 2518(5).  Title 18, § 2518(5) states, in part:

> Every order and extension thereof . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter, and must terminate upon the attainment of the authorized objective … .

The Order of May 6, 2013 issued by Judge Eaves expressly provided that monitoring of conversations was to terminate if it was determined that the conversations were unrelated to communications subject to interception under 18 U.S.C. §§ 2510-2521 as well as C.J. §§ 10-401 through 10-414.   ECF 78-4 at 7.   In addition, Judge Eaves incorporated by reference "Minimization Guidelines" approved by the State court.  Those guidelines are contained at ECF 78-5, and provided that, for the first three days, all calls intercepted would be both monitored and

recorded during the first three minutes but, thereafter, minimization would be required.  The purpose of this procedure was to facilitate identification of voices and recognition of patterns of conversation.

To be sure, unnecessary intrusions are to be avoided to the extent possible.  In determining whether the minimization requirement of 18 U.S.C. § 2518(5) has been met, the court applies a standard of reasonableness on a case-by-case basis.  *United States v. Bautista*, 972 F.2d 342 (4th Cir. 1992).  As the defense concedes, "[r]easonableness is the overarching standard … ."  ECF 74 at 7.

In the course of interception, it is difficult to know in advance which conversations ultimately might be "irrelevant and should have been terminated."  *United States v. LaGorga*, 336 F. Supp. 190, 196 (W.D. Pa. 1971).  This is why minimization cannot be judged by hindsight.  Indeed, "monitoring agents are not gifted with prescience and cannot be expected to know in advance what direction a conversation will take."  *Id.*  Even when non-criminal matters are mentioned, monitoring agents need not cease monitoring, because the parties to a conversation often discuss other matters, and it can be difficult to determine whether the conversation will resume as to the criminal enterprise.  *See United States v. Mansoori*, 304 F.3d 635, 645 (7th Cir. 2002).  Moreover, "[l]arge and sophisticated conspiracies may justify more electronic surveillance than a single criminal act," particularly when "the purpose of the intercept order(s) is to learn the identities of far-flung conspirators and define the reach of the conspiracy, as well as to incriminate the person whose phones are tapped."  *United States v. Daly*, 535 F.2d 434, 441 (8th Cir. 1976).  Latitude is also warranted when conspirators use "codes and specialized jargon, making criminal conversations more difficult to detect and decipher … ."  *United States v. Uribe*, 890 F.2d 554, 557 (1st Cir. 1989).

In addition, the degree of judicial supervision of the surveillance is relevant.  *See United States v. Charles*, 213 F.3d 10, 22 (1st Cir. 2000); *see also United States v. Carter*, 449 F.3d 1287, 1296-97 (D.C. Cir. 2006) (noting that the prosecutor instructed agents on minimization and reviewed call records for compliance); *United States v. Eiland*, 398 F. Supp. 2d 160, 175 (D.D.C. 2005) (citing government's procedures and judicial supervision as factors tending to show government's compliance with minimization requirement).

"Where the authorizing judge has required and reviewed [analytic] reports at frequent intervals, a reviewing court may take such supervision through reports into consideration in determining whether a reasonable effort to minimize was attempted."  *United States v. Armocida*, 515 F.2d 29, 44-45 (3d Cir. 1975).

Judge Eaves required the submission of weekly progress reports, informing her of various aspects of the monitoring of the calls.  *See*, *e.g.*,  ECF 78-7.  At the conclusion of each report, Judge Eaves authorized continued interception.  The government explains that, "in many instances investigators did not know the identities of numerous co-conspirators that were obtaining narcotics," ECF 78 at 10, and cell phones were used by unknown persons.  In addition, the government observes that there was a high volume of calls, but the calls were generally of short duration.

As the government points out, "courts generally draw a line at the two-or- three-minute mark and exclude such short-duration  calls from consideration."  ECF 78 at 12.  *See*, *e.g.*, *United States v. Yarbrough*, 527 F.3d 1092, 1098 (10th Cir. 2008); *United States v. Dumes*, 313 F.3d 372, 380 (7th Cir. 2002).  The rationale is that "even a seasoned listener would have been hard pressed to determine with any precision the relevancy of many of the calls before they were completed."  *Scott v. United States*, 436 U.S. 128, 142 (1978).

Miller also contends that the government failed to satisfy the exhaustion requirement under 18 U.S.C. § 2518(1)(c).  In his view, "the affidavits demonstrate that the investigative techniques in place were flourishing," and "[n]umerous investigative tools were working well to provide incriminating information."  ECF 74 at 9.

The Maryland and federal statutes include corresponding provisions regarding the requirement that all wiretap applications demonstrate exhaustion of other investigative techniques.  *Compare* C.J. § 10-408(a)(1)(iii) *and* C.J. § 10-408(c)(1)(iii) *with* 18 U.S.C. § 2518(1)(c) *and* 18 U.S.C. § 2518(3)(c).  As the Fourth Circuit said in *United States v. Bullock*, 203 F.3d 823 at *4 (4th Cir. 2000) (per curiam) (unpublished), because the exhaustion requirements under Maryland and federal wiretap law are identical, it is "of little consequence" as to which law is used to analyze exhaustion.  *Id.*

Of import here, in order to obtain authorization for a wiretap, the government is not required to demonstrate that other investigatory methods have been "wholly unsuccessful" or that it has exhausted "*all* possible alternatives to wiretapping."  *United States v. Smith*, 31 F.3d 294, 1297 (4th Cir. 1994), *cert. denied*, 513 U.S. 1181 (1995); *see also Clerkley*, 556 F.2d 709; *United States v. Nunez*, 877 F.2d 1470, 1472 (10th Cir. 1989) (law enforcement official not required to exhaust all conceivable investigative procedures before seeking wiretap).  The exhaustion requirement is "simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime."  *United States v. Kahn*, 415 U.S. 143, 153, n.12 (1974); *see United States v. Oriakhi*, 57 F.3d 1290, 1298 (4th Cir. 1995), *cert. denied*, 516 U.S. 952 (1995).  In other words, "[t]hese procedures were not to be routinely employed as the initial step in criminal investigation."  *United States v. Giordano*, 416 U.S. 505, 515 (1974).

Conversely, the purpose of the statutory requirement "is not to foreclose electronic surveillance until every other imaginable method of investigation has been successfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques." *United States v. Pacheco*, 489 F.2d 554, 565 (5th Cir. 1974).  Nor need a wiretap be used only as a last resort. *United States v. Kerrigan*, 514 F.2d 35, 38 (9th Cir. 1975).

Due to the nature of certain criminal organizations, informants are often unable to have contact with the individuals who are at the highest levels of the organization, thus making wiretaps necessary.  *Clerkley,* 556 F.2d at 714-15; *see also United States v. Leavis,* 853 F.2d 215, 221 (4th Cir. 1988) (noting that sufficient information was provided to the court to allow it to determine that the confidential informant would be unable to provide information regarding the upper levels of the conspiracy).  Likewise, courts have recognized that other investigative techniques, such as questioning persons involved in the conspiracy, often result in alerting the conspirators to the existence of an investigation, which could then jeopardize both the ongoing investigation and the lives of informants and undercover officers.  *United States v. Kelley*, 140 F.3d 596, 605 (5th Cir. 1998); *United States v. Killingsworth*, 117 F.3d 1159, 1164 (10th Cir. 1997), *cert. denied*, 522 U.S. 961 (1997).

The government's burden of showing the need for a wiretap "is not great, and the adequacy of such a showing is 'to be tested in a practical and commonsense fashion' … ." *Oriakhi*, 57 F.3d at 1298 (citation omitted).  To be sure, a boilerplate recitation may be insufficient to demonstrate the exhaustion of traditional investigative procedures. *Id*.  The affidavit in support of the wiretap application must be case-specific and provide sufficient detail to allow the judge to determine the necessity for a wiretap. *Id.; see Leavis*, 853 F.2d at 221.

However, the fact that the affidavit includes assertions about some traditional investigative procedures that *are* boilerplate does not preclude the finding of necessity. *See United States v. Milton,* 153 F.3d 891, 895 (8th Cir. 1998).

Courts have also held that, in assessing the need for a wiretap, affiants are authorized to rely upon, and courts are entitled to consider, their knowledge, training, and experience as to whether a particular investigative technique will succeed or fail.  *See Smith,* 31 F.3d at 1299 (issuing court may take into account affirmations which are founded in part on experience of specially trained agents).   "The presence of conclusory language [regarding investigative techniques] in the affidavit will not negate a finding of necessity if the affidavit, as a whole, alleges sufficient facts demonstrating necessity."  *United States v. Torres,* 908 F.2d 1417, 1423 (9th Cir. 1990); *Clerkley,* 556 F.2d at 715 (reasonable conclusions about the productivity of certain techniques were sufficient to show need).  And, deference is given to the issuing judge's determination that the wiretap applications provided sufficient information to satisfy the exhaustion requirement of 18 U.S.C. § 2518(3)(c).

Here, the Wiretap Affidavit recounts the many investigative steps that were utilized, others that were tried, and others regarded as too dangerous or unlikely to succeed even if tried. ECF 78-3 at 36-42.  To illustrate, although confidential informants were able to make controlled purchases from the defendant, they were unable to provide information as to the defendant's source of supply.  In addition, the affiants stated that the defendant resided in a "private gated community, meaning to gain access to the complex, you must enter through a security gate." ECF 78-3 at 38-39.  As a result, they claimed that it was "difficult to conduct surveillance" of Miller.  *Id*. at 39.  And, the affiants recounted: "MILLER is continually renting new cars each week."  *Id*.  This added to the challenge of conducting surveillance of Miller.

Judge Eaves determined that the exhaustion requirement was satisfied.  I see no basis to disagree with her conclusion.

Miller also complains that the challenged wiretap orders "allowed law enforcement officers to continue searching until, in the sole discretion of law enforcement, they felt they had enough evidence."  ECF 74 at 10.  He asserts:  "The challenged orders failed to designate any 'authorized objectives' that would serve as a check on law enforcement discretion under 18 U.S.C. § 2518(5)."  *Id*.  Miller adds: "The challenged orders statutory deficiencies under § 2518(5) giving the officer's [sic] unbridled authority to search, allotted in thirty day increments, crossed the line drawn by the Particularity Cause of the Fourth Amendment and converted the surveillance into a general search."  *Id*.

Once again, I disagree.  As the government points out, the defendant "overlooks or ignores that the decision to continue the use of electronic surveillance was not 'discretionary' with law enforcement.  Rather, it was Judge Eaves who determined whether continued electronic surveillance was authorized."  ECF 78 at 16.  In this regard, the government points to the frequent progress reports provided to Judge Eaves by the State, which she reviewed before authorizing continued interceptions.  *See*, *e.g.*, ECF 78-7.  I see no violation of the Particularity Clause of the Fourth Amendment.

As indicated, Miller also argues that calls between Ortiz-Gutierrez and defendant were unlawfully intercepted when both were located in Pennsylvania.  The defendant is incorrect. *Davis v. State*, 426 Md. 211, 43 A.3d 1044 (2012), provides guidance.

In *Davis*, Montgomery County, Maryland law enforcement officers, situated at a "listening post" in Montgomery County, intercepted a mobile phone communication from a target mobile phone, caller, and receiver, all located in Virginia.  The law enforcement officers

were acting in accordance with an ex-parte order issued by a Montgomery County circuit court judge pursuant to C.J. § 10-408(c).  As a result of the intercepted communications, the police seized drugs from Davis.  He alleged that the seizure was illegal, because the wiretap order did not authorize interception of "extra territorial communication."  426 Md. at 214, 43 A.3d at 1045.  Interpreting the Maryland statute, the Maryland Court of Appeals disagreed.

The court recognized that the Maryland statute is an "'offspring'" of Title III.  *Id*. at 214, 43 A.3d at 1046.  As a result, the court adopted "the federal gloss in determining the proper jurisdiction and scope for an ex-parte wiretap order."  *Id*.  It stated: "Thus, as long as the 'listening post' where the law enforcement officers first hear the intercepted communications is within the geographical jurisdiction of the court issuing the order, the interception is proper under the Maryland statute."  *Id*.  Further, the court opined: "[W]e conclude that interception of a wire, oral, or electronic communication, for the purposes of the Maryland wiretap statute, occurs where law enforcement officers capture or redirect first the contents of the communication overheard by the wiretap and where they heard originally the communication.  Therefore, as long as the 'listening post' was located within the territorial jurisdiction of the court issuing the ex-parte wiretap order, neither the physical location of the mobile phone at the time the call was placed and during the communication or the recipient of the call are material."  *Id*. at 218, 43 A.3d at 1048.

In this case, Detective Aaron Penman, a member of the Harford County Narcotics Task Force and a Sheriff in Harford County for almost 15 years, testified at the motions hearing that the "listening post" in connection with the investigation of the defendant was situated in Harford County, and it was used throughout the investigation.  Noting that all intercepted calls were routed to Harford County, Penman stated that all intercepted conversations were heard in

Harford County, regardless of the location of the defendant.  Therefore, Miller's challenge is unavailing.

Finally, even assuming, *arguendo*, that there is any merit to any of defendant's arguments, I would be compelled to find that the law enforcement officers were entitled to rely on facially valid wiretap orders.  In doing so, they acted in good faith, within the meaning of *United States v. Leon*, 468 U.S. 897 (1984), and its progeny, discussed *infra*.

### 2.  **Motion to Suppress Evidence Obtained or Derived From GPS (ECF 75)**

Defendant has moved to suppress evidence obtained by or derived from GPS monitoring. Defendant challenges the court orders that were issued by the District Court of Maryland authorizing, for a period of 60 days, the use of an electronic tracking device attached to the exterior of certain vehicles.  *See* "GPS Motion," ECF 75.

At oral argument, defense counsel submitted as to the contention that the applications for the court orders were not supported by probable cause and that, to the extent the applications and orders authorized the use of GPS devices on "future rental cars that may be utilized by the defendant," the "prerequisites for anticipatory search warrants have not been met."  *See* ECF 75 at 5.  But, defense counsel argued that, with respect to the Court Order of April 30, 2013 (ECF 75 at 13, Ex. A-2), the use of the GPS devices should have been limited to the two vehicles rented by defendant in April 2013, which were specifically identified in the corresponding application for the use of a GPS device (ECF 75 at 8, Ex. A-1).  He reasoned that the order only authorized the use of GPS on "the aforementioned vehicles," and the two vehicles rented in April 2013 were the only vehicles specifically identified in the application.

On or about April 30, 2013, Harford County Detective Aaron Penman applied, under oath, for a court order authorizing the use of an electronic tracking device ("GPS") to be attached

to the exterior of rental vehicles to be "utilized" by Miller for the next 60 days.  ECF 75 at 9, Ex. A-1.  The application explained that Miller operated multiple rental cars to engage in drug transactions, noting that he rented one from Dollar/Thrift in the second week of April 2013, and one from Avis in the last week of April 2013.  In addition, the application recounted that records from Dollar/Thrift revealed that Miller had rented vehicles on a weekly basis since 2011.  *Id.* And, the application recounted that Miller used a rental vehicle as far back as 1997, to transfer 45-50 pounds of marijuana.  *Id.* at 11.

The District Court for Harford County issued an order on April 30, 2013 ("Order of April 30, 2013), authorizing an electronic tracking device upon "the exterior of the aforementioned vehicles, utilized by MILLER. . . ."  ECF 75 at 14, Ex. A-2.

Detective Penman applied for another GPS authorization on May 8, 2013, with respect to a white 2004 Ford van.  ECF 75 at 17, Ex. B-1.  The application stated that the vehicle was owned by Charmaine Coldiron and operated by Miller.  *Id.*  Penman recounted that defendant was seen operating that vehicle on May 7, 2013, during a drug transaction.  *Id.* at 19.  The court issued an Order authorizing the requested relief on the same date.  ECF 75 at 23, Ex. B-2.

On May 26, 2013, Detective Penman submitted another "Application For Court Order," (ECF 75 at 26, Ex. C-1), requesting authorization to place an electronic tracking device on a brown 2004 Dodge sedan owned by Warmington and "associated" with defendant.  The application stated that, after intercepted drug conversations, Miller was observed entering the trunk compartment of the vehicle.  *Id.* at 28.  The court issued an order the same day, authorizing the requested relief.  *See* ECF 75 at 2, Ex. C-2.

Then, on June 11, 2013, Detective Penman submitted another "Application For Court Order," to place an electronic tracking device on a 2004 Toyota Camry 4S, registered to

Warmington and "associated" with defendant Miller.  ECF 75 at 35, Ex. D-1.  Penman averred that Miller was using the vehicle to facilitate his drug operation.  *Id.* at 38.  According to defense counsel, the order was approved on the same date.  *See* ECF 75 at 41.

Defendant asserts that all of the applications and court orders are "nearly identical in almost every respect."  ECF 75 at 2.  However, he complains that the application submitted under oath by Detective Penman on April 30, 2013, did not identify a specific vehicle by registration number, in contrast to the other applications.  And, as noted, he claims that the Order of April 30, 2013 applied only to the "aforementioned" two rental vehicles specifically identified in the application, which were rented by Miller in April 2013.

I shall assume, *arguendo,* that Miller has standing to challenge the use of the GPS devices on vehicles that were not registered to him or owned by him.  Of import here, the government notes that at trial it only intends to introduce evidence recovered from the 2004 Ford van registered to Ms. Coldiron.  It also represents that the evidence was obtained pursuant to a search warrant predicated on independent probable cause.  *See* ECF 78 at 23; Warrant, ECF 78-8.  On this basis, defendant's GPS claims appear moot.

Alternatively, as to the Order of April 30, 2013, I am satisfied that the State judge had probable cause to believe that Miller was using rental vehicles for his drug distribution, and that he frequently, if not weekly, changed rental vehicles.  Moreover, law enforcement could not know in advance the particulars of the vehicles to be rented in the future by Miller.  The reference in the application to the vehicles from Dollar/Thrift and Avis in April 2013 served to illustrate to the State court the frequency with which Miller rented (and changed) vehicles.  The only sensible interpretation of the order's reference to "the aforementioned vehicles" was that it authorized, for 60 days, the use of a GPS device on any vehicles that Miller would rent in that

limited time frame.  Law enforcement could not know in advance the particulars of those vehicles.

In any event, Detective Penman acted in good faith in relying on the court order authorizing the use of the GPS devices on unknown vehicles to be rented by Miller in the ensuing 60 days.

The good faith exception to the exclusionary rule was first announced by the Supreme Court in 1984 in *United States v. Leon*, 468 U.S. 897 (1984), and the companion case of *Massachusetts v. Sheppard*, 468 U.S. 981 (1984).  In establishing a good faith exception to the exclusionary rule, *Leon* provided for the admissibility of evidence seized pursuant to a warrant subsequently determined to be invalid, if the executing officers' reliance on the warrant was "objectively reasonable." *Leon,* 468 U.S. at 922. *See also Herring v. United States*, 555 U.S. 135, 145 (2009); *United States v. Doyle,* 650 F.3d 460, 467 (4th Cir. 2011); *United States v. Perez,* 393 F.3d 457, 461 (4th Cir. 2004).

Notwithstanding the importance of the exclusionary rule to Fourth Amendment jurisprudence, the Supreme Court determined in *Leon* that "suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." *Leon,* 468 U.S. at 918.  In *Sheppard*, 468 U.S. at 989-90, the Supreme Court added: "[W]e refuse to rule that an officer is required to disbelieve a judge who has just advised him . . . that the warrant he possesses authorizes him to conduct the search he has requested."

Ordinarily, a "'warrant issued by a magistrate . . . suffices to establish' that a law enforcement officer has 'acted in good faith in conducting the search.'" *Leon,* 468 U.S. at 922 (citation omitted).  As noted, the *Leon* Court explained that the standard for assessing the

officer's good faith reliance on the magistrate's probable cause determination is one of objective reasonableness.   *Leon* teaches that the "good-faith inquiry is confined to the objectively ascertainable question whether a reasonable well trained officer would have known that the search was illegal" in light of "all of the circumstances."   468 U.S. at 922 n.23.   *See United States v. McKenzie-Gude*, 671 F.3d 452, 459 (4th Cir. 2011).   *Leon* said, 468 U.S. at 926:

> In the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.

The *Leon* Court also said, *id.* at 922: "We conclude that the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion."

*Leon* made clear that there are four circumstances when exclusion of evidence remains the appropriate sanction, even if an officer "has obtained a warrant and abided by its terms." *Leon*, 468 U.S. at 922.  This is because "the officer's reliance on the magistrate's probable-cause determination . . . must be objectively reasonable, and it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Id.* at 922-23 (internal quotations, citations, and footnotes omitted).

The four situations when the sanction of exclusion is an appropriate remedy are as follows:  1) the magistrate or judge who issued the warrant was misled by information in an affidavit that the affiant knew was false or would have known but for his reckless disregard for the truth; 2) the issuing magistrate wholly abandoned his judicial role; 3) the affidavit supporting the warrant is "'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'"; 4) the warrant is "so facially deficient — i.e., in failing to particularize the place to be searched or the things to be seized — that the executing officers cannot

reasonably presume it to be valid." *Leon,* 468 U.S. at 923 (citations omitted).  *See United States v. DeQuasie,* 373 F.3d 509, 519-520 (4th Cir. 2004).

I am mindful of what the Supreme Court said in *Davis v. United States,* ____ U.S. ____, 131 S.Ct. 2419 (2011), in regard to the exclusionary rule.  Exclusion of evidence is "not a personal constitutional right, nor is it designed to redress the injury occasioned by an unconstitutional search."  *Id.* at 2426.  Rather, its purpose is to "deter future Fourth Amendment violations."  *Id.*  What the Fourth Circuit said in *United States v. Wilks,* 647 F.3d 520, 523 (2011), is also apt:  "Exclusion of evidence only is appropriate if the deterrence benefits of suppression outweighs the heavy societal costs of exclusion."

With these principles in mind, I see no basis to suppress on the grounds advanced by Miller.  Law enforcement authorities acted in good faith in construing the order to apply to vehicles that Miller would rent in the ensuing 60 days, and not to the two vehicles that Miller had previously rented in April 2013 (*i.e.,* the "aforementioned" vehicles).  That construction would be nonsensical.

### 3.  **Motion to Suppress Warrantless Search of Cellphones**

In ECF 99, defendant challenges the post-arrest warrantless search of his cellphones, based on the Supreme Court's recent decision in *Riley v. California*, ____ U.S. ____, 134 S. Ct. 2473 (2014).  There, the Court held that a warrant is required in order to search a cellphone, even when the cellphone is seized incident to arrest.

Of import here, defendant was arrested on June 22, 2013.  Thus, his arrest occurred a full year before the decision announced by the Supreme Court in *Riley*.

According to Detective Penman, six cellphones were recovered from the rental vehicle at the time of Miller's arrest on June 22, 2013.  Detective Gregory activated them, *i.e.,* turned them

20

on without a warrant.  However, he did not read or review the content contained on the phone.

Rather, he sought to identify the seized phones.  Put another way, Gregory activated the phones

to confirm the phone numbers, by way of a call to the wire room, to verify that the phones seized

from the defendant's vehicle had the same phone numbers that had been intercepted pursuant to

court authorized wiretaps.

At the time law enforcement activated defendant's cellphones, there was binding judicial

precedent in the Fourth Circuit that permitted the warrantless search of the contents of a cell

phone, incident to arrest.  *See United States v. Murphy*, 552 F.3d 405, 411-12 (4th Cir. 2009)

(holding officers may seize cellphones incident to arrest and retrieve text messages and other

information without a search warrant); *see also United States v. Graves*, 545 Fed. App'x 230,

234 (4th Cir. 2013) (same).  Until the Supreme Court's decision in *Riley*, *Murphy* remained good

law in the Fourth Circuit.  Thus, the government urges that the exclusionary rule is not

appropriate here, because law enforcement agents were acting in accordance with what was

understood at the time to have been the law.

In my view, in June 2013, law enforcement agents were not required to anticipate the

decision in *Riley*, decided in June 2014.  Therefore, the exclusionary rule is inapt here.  Because

the warrantless inspection of Miller's cell phones upon his arrest preceded the *Riley* decision, I

agree with the government that it is entitled to rely on the good faith exception to the

exclusionary rule, discussed *supra*.  *See Leon*, 468 U.S. at 923-24; *see also United States v.

Stephens*, ____ F.3d ____, 2014 WL 4069336 (4th Cir. Aug. 19, 2014) (declining to apply the

exclusionary rule with respect to the warrantless use of a GPS device on a vehicle prior to the

decision in *United States v. Jones*, ____ U.S. ____, 132 S. Ct. 945, 949 (2012)).

The exclusionary rule is a "'prudential' doctrine," fashioned "to 'compel respect for the constitutional guaranty.'"  *Davis v. United States*, ____ U.S. ____, 131 S. Ct. 2419, 2426 (2011) (citations omitted).  It "is 'not a personal constitutional right,' nor is it designed to 'redress the injury' occasioned by an unconstitutional search."  *Id.* (quoting *Stone v. Powell*, 428 U.S. 465, 486 (1976)); *see Leon*, 468 U.S. at 906.  Indeed, the use of evidence obtained in violation of the Fourth Amendment "'work[s] no new Fourth Amendment wrong,'" *id.* (quoting *United States v. Calandra*, 414 U.S. 338, 354 (1974)) (alteration in *Leon*), and exclusion cannot remedy the constitutional violation.  *Id.*  Because "[t]he [exclusionary] rule's sole purpose . . . is to deter future Fourth Amendment violations," *Davis*, 131 S. Ct. at 2426,  in the absence of "'appreciable deterrence,' exclusion is 'clearly . . . unwarranted.'"  *Id.* (quoting *United States v. Janis*, 428 U.S. 433, 454 n. 29 (1976)) (alteration in *Davis*).

To be sure, "[e]xclusion exacts a heavy toll on both the judicial system and society at large," because "[i]t almost always requires courts to ignore reliable, trustworthy evidence." *Davis*, 131 S. Ct. at 2427.  The "unbending application" of the exclusionary rule "would impede unacceptably the truth-finding functions of judge and jury," and "generat[e] disrespect for the law and administration of justice."  *Leon*, 468 U.S. at 907-08 (internal quotations omitted).  As a result, the exclusionary rule calls for a "balancing approach," which entails weighing the deterrent effect of suppression against the costs of exclusion, on a case-by-case basis.  *Id.* at 913.  To warrant exclusion, the "deterrence benefits of suppression must outweigh its heavy costs." *Davis*, 131 S. Ct. at 2427.

The cost of exclusion is particularly high — and often disproportionate to exclusion's deterrent effect — "when law enforcement officers have acted in objective good faith or their transgressions have been minor."  *Leon*, 468 U.S. at 908.  In *Leon*, the Court considered whether

"suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant" was justified.  *Id*. at 922.  Answering this question in the negative, the Court held that a police officer's reliance on a technically sufficient warrant, supported by a magistrate judge's probable cause determination, was objectively reasonable, and thus evidence seized pursuant to an invalid warrant was not subject to suppression.  *See id.* at 922-23.  Quoting *United States v. Peltier*, 422 U.S. 531, 539 (1975), the *Leon* Court explained, 468 U.S. at 919:

> "The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force."

*See also Herring*, 555 U.S. 135 (declining to suppress evidence based on police record-keeping error).

The "good faith" exception carries equal force when law enforcement agents act in reasonable reliance on judicial decisions authorizing their conduct, although the conduct is subsequently deemed unconstitutional.  *See Davis*, 131 S. Ct. at 2428-30 (holding that exclusionary rule did not apply to evidence obtained by officers acting in reliance on then-binding federal appellate precedent, although precedent was subsequently overruled and the officers' conduct held to violate the Fourth Amendment); *Stephens*, *supra*, 2014 WL 4069336.

In *Davis*, 131 S. Ct. 2419, the Supreme Court considered the legality of a search that violated the Supreme Court's decision in *Arizona v. Gant*, 556 U.S. 332 (2009), but occurred two years prior to the ruling in *Gant*.  In *Gant*, the Court held that a warrantless vehicle search incident to lawful arrest is not valid if it occurs after the defendant is arrested, handcuffed, and placed in the back of a patrol car.  *See id.* at 335.  In so holding, the Court departed from the

decision in *New York v. Belton*, 453 U.S. 454 (1981), which "was widely understood to have set down a simple, bright-line rule" authorizing warrantless "automobile searches incident to arrests of recent occupants, regardless of whether the arrestee . . . was within reaching distance of the vehicle at the time of the search." *Davis*, 131 S. Ct. at 2424 (citing *Thornton v. United States*, 541 U.S. 615, 628 (2004) (Scalia, J., concurring in the judgment)).  At the time of the search at issue in *Davis*, the search comported with appellate precedent in the Eleventh Circuit, which had "long read *Belton* to establish [such] a bright-line rule." *Davis*, 131 S. Ct. at 2426 (citing *United States v. Gonzalez*, 71 F.3d 819, 822, 824-827 (11th Cir. 1996)).

The *Davis* Court held that when law enforcement agents conduct a search in objectively reasonable reliance on binding appellate precedent, police culpability is wholly absent.  131 S. Ct. at 2428-29.  It reasoned, *id.*:

> The officers who conducted the search did not violate Davis's Fourth Amendment rights deliberately, recklessly, or with gross negligence.  Nor does this case involve any 'recurring or systemic negligence' on the part of law enforcement. The police acted in strict compliance with binding precedent, and their behavior was not wrongful.  Unless the exclusionary rule is to become a strict-liability regime, it can have no application in this case.

The Court elaborated: "[W]hen binding appellate precedent specifically *authorizes* a particular police practice, well-trained officers will and should use that tool to fulfill their crime-detection and public-safety responsibilities." *Id.* at 2429 (emphasis in original).  In the Court's view, "all that exclusion would deter in this case is conscientious police work." *Id.*; *see also Illinois v. Krull*, 480 U.S. 340, 350 (1987) ("If the statute is subsequently declared unconstitutional, excluding evidence obtained pursuant to it prior to such a judicial declaration will not deter future Fourth Amendment violations by an officer who has simply fulfilled his responsibility to enforce the statute as written.").

*United States v. Wilks*, 647 F.3d 520 (4th Cir. 2011), also provides guidance.  There, the Fourth Circuit considered a search akin to that in *Davis*.  At the time of the search, it comported with then-binding Fourth Circuit precedent, later overruled by *Gant*.  *See id.* at 521-22.  Law enforcement officers searched the front seat of a vehicle after handcuffing the defendant and placing him in the back seat of the patrol car.  *Id.* at 521.  The parties did not dispute that, under *United States v. Milton*, 52 F.3d 78, 80 (4th Cir. 1995), the search of the vehicle "was permissible at the time."  *Wilks*, 647 F.3d at 522.  Finding the case to be "on all fours" with *Davis*, the Fourth Circuit held that the exclusionary rule did not bar the admission of evidence recovered during the search.  *Id.* at 524.

As noted, the government urges that the exclusionary rule is not appropriate here, because at the relevant time law enforcement agents were acting in accordance with what was the law, i.e., that under *Murphy, supra,* the warrantless search of a cell phone incident to arrest was lawful.  I agree.  Therefore, I decline to apply the exclusionary rule to the search of the cell phones at the time of Miller's arrest.

### 4.  **Motion to Suppress Tangible Evidence (ECF 76)**

Defendant asserts a boilerplate challenge to the search of his residence in Owings Mills on June 22, 2013.  The search was conducted pursuant to a search warrant for defendant's home, obtained on June 14, 2013.  The application and affidavit are set forth at ECF 78-8.

The Fourth Amendment to the Constitution of the United States guarantees, *inter alia*, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  "'[T]he underlying command of the Fourth Amendment is always that searches and seizures be reasonable.'"  *United States v. Sowards*, 690 F.3d 583, 588 (4th Cir. 2012) (*quoting Wilson v. Arkansas*, 514 U.S. 927, 931 (1995)) (alteration in *Sowards*).

"'At the very core'" of the Fourth Amendment "'stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'"  *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)).  As the Supreme Court has said: "[T]he Fourth Amendment has drawn a firm line at the entrance to the house.  Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."  *Silverman*, 365 U.S. at 511.

Of particular relevance here, the Warrant Clause of the Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and persons or things to be seized."  U.S. Const. amend IV.  This clause requires an affidavit supporting a request for a search warrant to show some factual basis for the belief that the suspect occupies or is otherwise connected to the targeted premises and that contraband or evidence will be found in that particular place.  This is known as the particularity requirement.  *See Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Dargan*, 738 F.3d 643, 647 (4th Cir. 2013); *United States v. Davis*, 690 F.3d 226, 241 (4th Cir. 2012); *United States v. Montieth*, 662 F.3d 660, 664 (4th Cir. 2011).

In *Maryland v. Garrison*, 480 U.S. 79, 84 (1987), the Supreme Court recognized that the purpose of the particularity requirement is to ensure "that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit."  Thus, "a search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional."  *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (internal quotation and citation omitted).  With regard to the particularity requirement, the Fourth Circuit has said: "At its core, the Fourth Amendment protects against general warrants that authorize exploratory rummaging in a person's

belongings . . . by requiring a particular description of the things to be seized." *United States v. Williams*, 592 F.3d 511, 519 (4th Cir. 2010) (citing *Andresen v. Maryland*, 427 U.S. 463, 480 (1976) (internal quotation marks omitted)).

The affidavit contains ample probable cause to satisfy the Fourth Amendment.  It also satisfies the particularity requirement.  Therefore, there is no merit to this claim.

An Order follows, consistent with this Memorandum Opinion.


Dated:  September 24, 2014                          _____/s/_____
                                                                      Ellen Lipton Hollander
                                                                      United States District Judge